United States District Court
Southern District of Texas
**ENTERED**
May 02, 2024
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| YVETTE S. ATKINSON, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:22-cv-04315 |
| | § | |
| STEPHEN PUSTILNIK, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### OPINION AND ORDER

This case arises out of the tragic death of Simon J. Atkinson ("Mr. Atkinson"). His widow, Plaintiff Yvette S. Atkinson ("Ms. Atkinson"), alleges that Fort Bend County Medical Examiner Stephen Pustilnik, M.D. ("Dr. Pustilnik") improperly delayed issuing her husband's final death certificate and then, in retaliation for Ms. Atkinson's filing of this lawsuit, falsely classified Mr. Atkinson's death as a homicide. Ms. Atkinson brings claims against Dr. Pustilnik in his individual capacity under 42 U.S.C. § 1983 for First Amendment retaliation; violation of her equal protection rights; violation of her substantive due process rights; and violation of her Fourth Amendment right to be free from unreasonable seizure. Ms. Atkinson also alleges that Fort Bend County, Fort Bend County Judge KP George[1] ("Judge George"), and Fort Bend County Commissioners Vincent Morales ("Morales"), Grady Prestage ("Prestage"), W.A. "Andy" Meyers ("Meyers"), Dexter L. McCoy ("McCoy"), and Kenneth R. DeMerchant ("DeMerchant") (collectively "the Fort Bend Defendants") "are liable because they ratified [Dr.] Pustilnik's actions or were deliberately indifferent to his misconduct." Dkt. 21 at 17. Judge George, Morales, Prestage, Meyers, McCoy, and DeMerchant (collectively "the Individual Fort Bend Defendants") are sued in their individual

---

[1] KP George has been incorrectly named by Ms. Atkinson as "J.P. George."

capacities.[2] Ms. Atkinson seeks actual damages, exemplary damages, costs, attorney's fees, and injunctive relief.

Pending before me are two motions to dismiss—one filed by Dr. Pustilnik, and the other filed by the Fort Bend Defendants. *See* Dkts. 27–28. Having reviewed the briefing and applicable law, I **GRANT IN PART** and **DENY IN PART** Dr. Pustilnik's motion to dismiss (Dkt. 27), and **GRANT** the Fort Bend Defendants' motion to dismiss (Dkt. 28).

## BACKGROUND[3]

On June 5, 2020, Mr. Atkinson died of a gunshot wound in Sugar Land, Texas. Forensic pathologist, Dr. William McClain ("Dr. McClain"), "performed an autopsy within days [of Mr. Atkinson's death] and found no evidence of foul play." Dkt. 21 at 3. The Sugar Land Police Department ("SLPD") investigated Mr. Atkinson's death and concluded Mr. Atkinson died by suicide. The SLPD's investigation included a firearms test using the gun found near Mr. Atkinson's body and the ammunition found in Mr. Atkinson's pocket. SLPD determined that "(1) that the gun found near Mr. Atkinson's body was the gun that he used to kill himself and (2) that the ammunition in his pocket matched the fatal bullet." *Id.* at 3. Mr. Atkinson's body was released to his family and cremated.

---

[2] Ms. Atkinson specifies that each of the Individual Fort Bend Defendants, with the exception of McCoy, is sued in his individual capacity. The Second Amended Complaint, the live pleading in this case, does not indicate whether McCoy is sued in his individual capacity, official capacity, or both. To be safe, I will assume McCoy is sued in both his individual and official capacities. *See Flagg v. Gusman*, No. CIV.A. 13-258, 2014 WL 4629206, at *2 (E.D. La. Sept. 15, 2014) ("The complaint is silent, however, as to whether Defendants are sued in their individual or official capacities. Accordingly, given this Court's duty to construe the complaint liberally, the Court will assume that Plaintiff sues Defendants in both capacities."). Even so, the official capacity suit against McCoy is redundant, given that Fort Bend County is a named defendant who is appearing in this litigation. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

[3] This section recounts the allegations set forth in the Second Amended Complaint. *See* Dkt. 21.

For Ms. Atkinson, obtaining a final death certificate was important because she stood to receive $1 million in life insurance benefits. Delayed issuance of Mr. Atkinson's final death certificate would, Ms. Atkinson claims, delay her recovery of insurance proceeds.

Approximately a week after the autopsy, no death certificate had been issued. Ms. Atkinson's brother, Steven Sanchez ("Sanchez"), called Dr. Pustilnik to inquire why a death certificate had yet to be issued (the "Sanchez Call"). The conversation allegedly became a "heated argument." *Id.* at 4.

A few days later, on June 16, 2020, an initial death certificate for Mr. Atkinson was released, signed by Dr. McClain. The death certificate stated that both Mr. Atkinson's cause and manner of death[4] were "Pending Investigation," and that autopsy findings were not available to complete the cause of death. Dkt. 27-1 at 4. Ms. Atkinson claims Dr. Pustilnik, upset by his phone conversation with Sanchez, "retaliated by refusing to list a cause of death on Mr. Atkinson's death certificate." Dkt. 21 at 4. A few months later, Sanchez contacted Judge George on behalf of Ms. Atkinson. Judge George told Sanchez that he could not do anything because of an ongoing investigation into Mr. Atkinson's death.

More than one year after Mr. Atkinson died, Dr. Pustilnik convened an inquest into Mr. Atkinson's death more than one year after he died. Ms. Atkinson alleges that Dr. Pustilnik "ordered [her] to produce all ammunition in the Atkinson household that had been purchased for the firearm that Mr. Atkinson used to kill himself, purportedly so [Dr.] Pustilnik could conduct his own firearms test" on the gun that allegedly killed Mr. Atkinson. *Id.* Although Ms. Atkinson contends Dr. Pustilnik did not need the ammunition in the house—which ultimately amounted

---

[4] It is important not to confuse cause of death with manner of death. The possible causes of death are as innumerable as the diseases and conditions that confront humanity. In contrast, there are only four manners of death: natural, accidental, suicide, and homicide. *See, e.g.*, *Reliastar Life Ins. Co. v. Thompson*, No. M-07-cv-140, 2008 WL 4327259, at *3 (S.D. Tex. Sept. 16, 2008); *see also* Dkt. 27-1 at 4.

to 75 rounds of ammunition—a local justice of the peace ordered its production. Ms. Atkinson ultimately produced the ammunition on June 1, 2022.

After the inquest, months passed without any word from Dr. Pustilnik on the cause and manner of Mr. Atkinson's death. In October 2022, Ms. Atkinson's counsel sent several communications to Fort Bend County officials, complaining about the delay and threatening litigation. Fort Bend County officials promised that Dr. Pustilnik would soon be issuing an amended death certificate listing the cause and manner of death.

On December 13, 2022, still awaiting Mr. Atkinson's final death certificate, Ms. Atkinson filed this lawsuit. On January 19, 2023, Dr. Pustilnik finally issued an amended death certificate. Depending what measure of time is used, it took 958 days; or 2 years, 7 months, 14 days; or 31 months, 14 days for Dr. Pustilnik to determine Mr. Atkinson's cause and manner of death. The amended death certificate lists Mr. Atkinson's cause of death as a gunshot wound of the head, and his manner of death as homicide.

Ms. Atkinson claims Dr. Pustilnik falsely classified Mr. Atkinson's manner of death as homicide "in retaliation for Mr. Sanchez's comments as well as the filing of this lawsuit." *Id.* at 17. According to Ms. Atkinson, she "now knows that she had better not make any complaint to or about [Dr.] Pustilnik lest he retaliate again." *Id.*

Dr. Pustilnik moves to dismiss, arguing he is entitled to qualified immunity. Dr. Pustilnik insists he has not violated a statutory or constitutional right and, even if he did, such a right was not clearly established at the time he issued Mr. Atkinson's death certificate. The Fort Bend Defendants have also moved to dismiss. The Fort Bend Defendants, as a whole, argue Ms. Atkinson has failed to state claim for ratification or supervisor liability. The Individual Fort Bend Defendants assert that qualified immunity protects them as well.

## LEGAL STANDARDS

### A.    RULE 12(b)(6)

To avoid early dismissal of a lawsuit, a plaintiff must file a complaint that provides "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). If the plaintiff fails "to state a claim upon which relief can be granted," dismissal is appropriate. FED. R. CIV. P. 12(b)(6). Overcoming this initial hurdle requires the plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard is lower than "a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). At this stage, I accept "all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff." *White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021). Thus, a Rule 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quotation omitted).

"In ruling on a Rule 12(b)(6) motion, a court generally limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff." *Tex. Health & Human Servs. Comm'n v. United States*, 193 F. Supp. 3d 733, 738 (N.D. Tex. 2016). "A written document that is attached to a complaint as an exhibit is considered part of the complaint and may be considered in a 12(b)(6) dismissal proceeding." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). There are also certain limited categories of documents outside of the pleadings that I may consider. First, I am permitted "to rely on documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quotation omitted). Second, I may consider "documents

attached to a motion to dismiss that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quotation omitted). Finally, I "may permissibly refer to matters of public record" without converting a motion to dismiss into a motion for summary judgment. *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994).

**B.    42 U.S.C. § 1983**

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation omitted).

"To state a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). Local governing bodies are not liable under § 1983 based merely on the actions of their employees. *See Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010). A plaintiff may sue a local governmental body under § 1983 only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690 (1978). Direct municipal liability under § 1983 requires a plaintiff to identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom." *Valle*, 613 F.3d at 541–42 (quotation omitted).

### C.   QUALIFIED IMMUNITY

Government officials sued in their individual capacity under § 1983 are entitled to qualified immunity, which is "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016). It is a judicially created doctrine designed to avoid "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). The doctrine arises from "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Id.* (cleaned up).

To overcome qualified immunity, a plaintiff must allege facts showing: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). "These steps may be considered in either order." *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018).

The first prong of the qualified immunity inquiry asks whether the facts alleged "show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a plaintiff's allegations, viewed favorably, do not establish a constitutional violation, no further inquiry is necessary. *See id.* "To surmount this barrier at the motion to dismiss stage, the plaintiffs must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm they have alleged and that defeat a qualified immunity defense with equal specificity." *Torns v. City of Jackson*, 622 F. App'x 414, 416 (5th Cir. 2015) (cleaned up).

"The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotation omitted). Governmental actors are "shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.* at 741. A plaintiff bears a heavy burden on this prong because a right is clearly established only if relevant precedent "ha[s] placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

## DR. PUSTILNIK'S MOTION TO DISMISS

Because Dr. Pustilnik maintains that he is entitled to qualified immunity, I must conduct the qualified immunity analysis described above.

### A.   FIRST AMENDMENT RETALIATION

Ms. Atkinson asserts First Amendment retaliation against Dr. Pustilnik. "[T]he First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of her exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). To state a claim for First Amendment retaliation, Ms. Atkinson must plead that "(1) [she] engaged in constitutionally protected activity, (2) the defendants' actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [her] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). The second element "requires some showing that [Ms. Atkinson's] exercise of free speech has been curtailed." *Id.* at 259.

Ms. Atkinson points to two distinct acts of retaliation: (1) the delayed issuance of Mr. Atkinson's final death certificate; and (2) the allegedly false

designation of Mr. Atkinson's manner of death as homicide on the final death certificate. I will address each event separately.

### 1.    Delayed Issuance of Final Death Certificate

Dr. Pustilnik argues that qualified immunity bars Ms. Atkinson's First Amendment retaliation claim for the delayed issuance of Mr. Atkinson's final death certificate because (1) there is no constitutional violation; and (2) even if there was a constitutional violation, the constitutional right in question was not clearly established at the time of the violation. Dr. Pustilnik advances three separate reasons there is no constitutional violation: (1) he took no adverse action against Ms. Atkinson; (2) Ms. Atkinson did not participate in the Sanchez Call; and (3) Ms. Atkinson's speech was not curtailed. I need only address the second issue as to why there is no constitutional violation.

Dr. Pustilnik contends that because Ms. Atkinson did not participate in the Sanchez Call, she is unable to satisfy the first element of such a claim: that she "engaged in constitutionally protected activity." *Keenan*, 290 F.3d at 258. Ms. Atkinson readily acknowledges that she did not participate in the Sanchez Call. Yet, she contends Dr. Pustilnik "may be held liable" because he retaliated against her "based on the constitutionally-protected actions of [her] agent or close affiliate"— her brother, Sanchez. Dkt. 33 at 6. In reply, Dr. Pustilnik frames the question as one of third-party standing, arguing that Ms. Atkinson lacks standing to assert claims on Sanchez's behalf. *See* Dkt. 35 at 5.

To the extent Dr. Pustilnik challenges Ms. Atkinson's standing, he is incorrect. Standing turns on whether the plaintiff has "suffered an injury in fact." *Adar v. Smith*, 639 F.3d 146, 150 (5th Cir. 2011). "[S]tanding does not depend upon ultimate success on the merits." *Id.* Thus, an Article III injury for purposes of constitutional standing is different from the adverse action or chilling injury required to state a First Amendment retaliation claim. Inasmuch as the parents in *Adar* stated an Article III injury by alleging that the state denied them a revised birth certificate, Ms. Atkinson states an Article III injury by alleging that Dr.

Pustilnik denied her a final death certificate for the 958 days that he refused to certify Mr. Atkinson's cause and manner of death.

Dr. Pustilnik is correct, however, that Ms. Atkinson's lack of participation in the Sanchez Call is fatal to her First Amendment retaliation claim based on the delayed death certificate. To start, Dr. Pustilnik rightfully notes that the Sanchez Call is the only constitutionally protected activity that is plausibly related to the delay. The correspondence Ms. Atkinson's counsel sent to the County Commissioners on her behalf is constitutionally protected activity, but it is not plausibly related to Dr. Pustilnik's delay in issuing the final death certificate because there is no allegation that Dr. Pustilnik even knew about these communications. This lawsuit is also constitutionally protected activity, but the delay of which Ms. Atkinson complains occurred *before* this lawsuit was filed. Dr. Pustilnik issued the final death certificate a mere five weeks after this lawsuit was filed, and there is no allegation that a five-week delay is an adverse action. Thus, insofar as Ms. Atkinson asserts First Amendment retaliation in the form of delay, the only constitutionally protected activity that matters is the Sanchez Call.

In her response to Dr. Pustilnik's motion to dismiss, Ms. Atkinson cites a case in which a court found that a plaintiff's attempt to serve officers through a process server—his agent—was constitutionally protected activity. *See* Dkt. 33 at 6 (citing *Mills v. City of Bogalusa*, 112 F. Supp. 3d 512, 517 (E.D. La. 2015)). Ms. Atkinson has clearly alleged that Sanchez was acting on her behalf—that Sanchez's words were *her* speech. Thus, Ms. Atkinson contends that, based on *Mills*, Sanchez's speech constituted *her* constitutionally protected activity. But not all speech made on another's behalf is protected under the law. The court in *Mills* only recognized the process server's actions as the plaintiff's speech because "access to the courts is protected by the First Amendment." 112 F. Supp. 3d at 516. Relatedly, "[a]n individual's personal First Amendment interest in his or her lawyer's speech on his or her behalf is a natural corollary of the First Amendment right to retain counsel." *Eng v. Cooley*, 552 F.3d 1062, 1076 (9th Cir. 2009).

At least one circuit court has observed that "a [family member]'s claim that adverse action was taken solely against that [family member] in retaliation for conduct of the other [family member] should be analyzed as a claimed violation of a First Amendment right of intimate association." *Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999). The "intimate human relationships [the Supreme Court has recognized] include marriage, the begetting and bearing of children, child rearing and education, and cohabitation with relatives." *Caleb v. Grier*, 598 F. App'x 227, 237 (5th Cir. 2015) (citing *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987)). "An intimate, loving relationship by itself, however, is not sufficient to create a familial expectation that our society and Constitution are prepared to recognize." *Wooley v. City of Baton Rouge*, 211 F.3d 913, 922 (5th Cir. 2000). The right is "limited to relationships 'that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1051–52 (5th Cir. 1996) (quoting *Rotary*, 481 U.S. at 545). Ms. Atkinson has not alleged any facts—e.g., whether she and Sanchez cohabitate, the roles they play in each other's lives, etc.—showing that her relationship with Sanchez falls within this ambit. Even if she had, Ms. Atkinson has not alleged that Dr. Pustilnik had any reason to know that Sanchez was her brother. Nor has Ms. Atkinson pointed to any authority showing that a sister's right to be free from retaliation for her brother's speech is clearly established in this circuit. *See Wooley*, 211 F.3d at 923 (declining to "definitively resolve" whether "the emotional ties between a minor and an unrelated adult care giver" were constitutionally protected because, even if they were, the right was not clearly established, meaning qualified immunity was warranted).

\* \* \*

For all these reasons, Dr. Pustilnik is entitled to qualified immunity on Ms. Atkinson's First Amendment retaliation claim for the delayed issuance of Mr.

Atkinson's final death certificate. The same is not true, however, of Ms. Atkinson's First Amendment retaliation claim based on Dr. Pustilnik's allegedly false designation of Mr. Atkinson's manner of death.

### 2.   *Furnishing a False Manner of Death*

Ms. Atkinson alleges Dr. Pustilnik retaliated against her when, a few weeks after she filed this lawsuit, Dr. Pustilnik issued a final death certificate designating Mr. Atkinson's manner of death as homicide. Dr. Pustilnik does not distinguish between the two separate adverse actions—the delay of the death certificate and its subsequent falsification—that Ms. Atkinson alleges were retaliatory. Because Ms. Atkinson clearly engaged in a constitutionally protected activity—the filing of this lawsuit[5]—prior to Dr. Pustilnik's allegedly false designation of Mr. Atkinson's manner of death, Ms. Atkinson's participation (or lack thereof) in the Sanchez Call is irrelevant to the false-manner-of-death retaliation claim. Thus, Dr. Pustilnik advances two arguments for why Ms. Atkinson's First Amendment retaliation claim for the delayed issuance of Mr. Atkinson's final death certificate fails to state a constitutional violation: (1) he took no adverse action against Ms. Atkinson; and (2) Ms. Atkinson's speech was not curtailed. Dr. Pustilnik further argues that, even if there was a constitutional violation, he is entitled to qualified immunity because the constitutional right in question was not clearly established.

### a.   Constitutional Violation

#### (1)   *Adverse Action*

Dr. Pustilnik argues he "did not take any action against [Ms.] Atkinson—much less action that is actionable under the First Amendment." Dkt. 27 at 16. In support of this argument, Dr. Pustilnik cites two inapposite cases. *See Colson*, 174 F.3d 498; *Pierce v. Tex. Dep't of Crim. Just., Inst. Div.*, 37 F.3d 1146 (5th Cir. 1994). Both cases "held that false accusations, verbal reprimands, and investigations were

---

[5] No one disputes that filing a lawsuit is a constitutionally protected activity. *See Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979) ("It is by now well established that access to the courts is protected by the First Amendment right to petition for redress of grievances.").

not actionable adverse *employment* actions." *Colson*, 174 F.3d at 511 (emphasis added). But these cases have nothing to say about whether an official's falsification of a vital record constitutes an adverse action.

Dr. Pustilnik's response suggests that Ms. Atkinson was not entitled to Mr. Atkinson's death certificate. *See* Dkt. 27 at 17 ("Pustilnik did not deny [Ms.] Atkinson any license, benefit, or permit she was otherwise entitled to receive. . . . [Ms.] Atkinson only claims that [Dr.] Pustilnik . . . made a false manner of death designation on[] ***Mr. Atkinson's*** death certificate."). By emphasizing Mr. Atkinson's name, I assume Dr. Pustilnik is implying that only the dead are entitled to accurate death certificates. That is nonsensical. It also flies in the face of Texas law, which recognizes that a "spouse" like Ms. Atkinson is an "immediate family member" and thus a "[p]roperly qualified applicant" entitled to such a vital record. 25 TEX. ADMIN. CODE § 181.1(13), (21). Texas law also criminalizes the falsification of a vital record. *See* TEX. HEALTH & SAFETY CODE § 195.004(a).

Dr. Pustilnik makes too much of his lack of connection to Ms. Atkinson's insurance company and the status of her insurance claim for Mr. Atkinson's death. The insurance company's refusal to pay death benefits is not the adverse action. The adverse action for which Ms. Atkinson seeks to hold Dr. Pustilnik responsible is the allegedly false designation of her husband's manner of death. If true, this criminal act is undoubtedly an adverse action.

### (2)   *Curtailment of Speech*

As for curtailment, Dr. Pustilnik oversells the requirement that Ms. Atkinson's speech be curtailed. To satisfy this pleading requirement, Ms. Atkinson must allege that she "reduced or changed [her] exercise of free speech in any way" after the lawsuit was filed. *McLin v. Ard*, 866 F.3d 682, 697 (5th Cir. 2017). Because "there is no justification for harassing people for exercising their constitutional rights," the "effect on freedom of speech . . . need not be great in order to be actionable." *Id.*

I agree with Dr. Pustilnik that Ms. Atkinson's allegation that she *would have* curtailed her speech—by insisting that her brother refrain from contacting Dr. Pustilnik—is insufficient to state that her speech has been curtailed. *See* Dkt. 27 at 20. But Ms. Atkinson has otherwise alleged curtailment. Ms. Atkinson has stated that "if another family member dies in Fort Bend County (God forbid), [she] now knows that she had better not make any complaint to or about [Dr.] Pustilnik lest he retaliate again." Dkt. 21 at 17. Construing this poorly worded allegation in the light most favorable to Ms. Atkinson, she has alleged that she will not criticize or contact Dr. Pustilnik in connection with any other family members' deaths. This is more than the conclusory allegation of "great personal damage" found insufficient in *McLin*. *See* 866 F.3d at 697.

Dr. Pustilnik argues that speculation about future curtailment is insufficient. But the "threat of specific future harm" is sufficient to allege a chilling effect. *Laird v. Tatum*, 408 U.S. 1, 14 (1972). Notwithstanding Ms. Atkinson's use of the words "if" and "God forbid," death is a certainty. *See Bel v. United States*, 452 F.2d 683, 688 (5th Cir. 1971) ("[T]he only certainties in life might be death and taxes."). Dr. Pustilnik's continued employment as the Fort Bend County Medical Examiner may be less certain than death, but I am unwilling to hold that a plaintiff cannot allege curtailment based on future events that are likely (if not certain) to occur. Part of the curtailment the Fifth Circuit found sufficient in *Keenan* was the plaintiff's statement that "he was afraid to travel in Precinct 5." 290 F.3d at 260. Ms. Atkinson's curtailment is no less substantive—the circumstances in which her speech is curtailed simply arise less frequently than traveling through a specific geographic area.[6]

---

[6] Keenan also alleged that "he backed off from direct involvement in helping expose unlawful practices in the constable's office." *Id.* (quotation omitted). But he later stated "that he videotaped one instance of suspected unlawful activity and filed a complaint with a state agency against Constable Tejeda." *Id.* Thus, his allegation of backing off from direct involvement was either not as important to the Fifth Circuit as his restricting his travel, or the Fifth Circuit chose to credit this allegation because it was not conclusory, despite it being implausible. Either way, Ms. Atkinson has plausibly alleged the threat of specific

* * *

For all these reasons, Ms. Atkinson states a First Amendment retaliation claim for Dr. Pustilnik's refusal to finalize her husband's cause of death, and thus satisfies the first prong of the qualified immunity inquiry. All that remains is the question of whether Dr. Pustilnik violated a clearly established right.

### b.    Violation of a Clearly Established Right

The second prong of the qualified immunity inquiry requires me to determine if the "right at issue was clearly established at the time of the defendant's alleged misconduct." *Jennings v. Patton*, 644 F.3d 297, 300 (5th Cir. 2011) (quotation omitted). Dr. Pustilnik argues that even if his actions violated a constitutional right, he is entitled to qualified immunity, as there was no clearly established authority which stands for the proposition that "making a false manner of death designation on[] a spouse's death certificate, is actionable under the First Amendment." Dkt. 27 at 21. That is simply not true.

Dr. Pustilnik's argument evidences a fundamental misunderstanding of the qualified immunity doctrine. Ms. Atkinson need not point to a case with precisely identical facts. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to [Dr. Pustilnik] that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 410 (5th Cir. 2009) (quotation omitted). "Answering in the affirmative requires the court to be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (cleaned up). "The central concept is that of 'fair warning': The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable

---

future harm to her free speech rights by stating that she will not criticize Dr. Pustilnik if another of her family members dies in Fort Bend County.

warning that the conduct then at issue violated constitutional rights." *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (cleaned up).

It is clearly established that public officials cannot retaliate against citizens for their speech. *See Colson*, 174 F.3d at 508 ("[T]he First Amendment prohibits . . . adverse government action against an individual because of her exercise of First Amendment freedoms."). Moreover, a person commits a Class C misdemeanor under Texas law if "the person refuses or fails to furnish correctly any information in the person's possession affecting a certificate or record," or "fails, neglects, or refuses to fill out a . . . death certificate." Tex. Health & Safety Code § 195.004(a)–(b). Thus, no reasonable official would think it constitutional to furnish a false manner of death on a vital record in retaliation for a lawsuit filed against the official. Accordingly, Dr. Pustilnik is not entitled to qualified immunity for Ms. Atkinson's claim that he retaliated against her by falsely designating the manner of her husband's death as homicide. This claim will survive Dr. Pustilnik's motion to dismiss.

## B.   VIOLATION OF EQUAL PROTECTION RIGHTS

Ms. Atkinson next brings a "class of one" equal protection claim against Dr. Pustilnik. Ms. Atkinson alleges that Dr. Pustilnik "singled [her] out" and "treated her far differently from similarly[]situated individuals" because he was "[m]otivated by his desire to retaliate" against her. Dkt. 21 at 18.

"The Equal Protection Clause [of the Fourteenth Amendment] directs that persons similarly situated should be treated alike." *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999). In *Village of Willowbrook v. Olech*, the Supreme Court reiterated that equal protection claims based on a "class of one" are cognizable. 528 U.S. 562, 564 (2000). To state such a claim, the plaintiff must sufficiently allege that "(1) he or she was treated differently from others similarly situated and (2) there was no rational basis for the disparate treatment." *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 824 (5th Cir. 2007).

Ms. Atkinson has failed to sufficiently allege that she was treated differently than other similarly situated individuals. The Fifth Circuit has explained that this inquiry is highly fact-specific.

> The legal requirement that a class-of-one plaintiff's comparators be similarly situated is not a requirement susceptible to rigid, mechanical application—there is no precise formula to determine whether an individual is similarly situated to comparators. Several of our sister circuits, confronting this issue, have stated that, in order to be similarly situated, comparators must be *prima facie* identical in all relevant aspects. But this statement simply raises new questions. What aspects of a particular case are relevant? What is relevant in one case might not be relevant in another, for example, and the degree to which others are viewed as similarly situated necessarily will depend substantially on the facts and context of the case. In short, the inquiry is case-specific and requires us to consider the full variety of factors than an objectively reasonable decisionmaker would have found relevant in making the challenged decision.

*Lindquist v. City of Pasadena*, 669 F.3d 225, 233–34 (5th Cir. 2012) (cleaned up).

Although her live "complaint generally alleges that other similarly situated individuals were treated differently, [Ms. Atkinson] points to no specific person or persons and provides no specifics as to their" particular situation. *Rountree v. Dyson*, 892 F.3d 681, 685 (5th Cir. 2018); *see also Smith v. Kimbhal*, 421 F. App'x 377, 379 (5th Cir. 2011) (affirming dismissal of an equal protection "class of one" claim because the plaintiff "provided insufficient information from which this or any other court could ascertain whether he is 'similarly situated'"). This pleading deficiency dooms her claim. Dr. Pustilnik is entitled to qualified immunity on this claim.

## C.   VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS

Ms. Atkinson also brings a claim against Dr. Pustilnik for violations of her substantive due process rights. She alleges that, "[m]otivated by his desire to retaliate" against her, Dr. Pustilnik "refused to perform a ministerial duty, *i.e.*, issuance of a death certificate." Dkt. 21 at 18.

The Fourteenth Amendment provides that no state shall deprive any person of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. A substantive due process claim "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Because the Due Process Clause of the Fourteenth Amendment "protects persons against deprivations of life, liberty, or property," individuals like Ms. Atkinson "who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *see also Conroe Creosoting Co. v. Montgomery Cnty.*, 249 F.3d 337, 341 (5th Cir. 2001) (requiring plaintiff bringing substantive due process claim to "first establish the existence of a property interest protected by the Fourteenth Amendment").

Ms. Atkinson contends that she has properly alleged that Dr. Pustilnik deprived her of both a liberty and property interest. I completely disagree.

To start, I will explore the liberty interest issue. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson*, 545 U.S. at 221 (cleaned up). Tellingly, the word "liberty" does not appear in Ms. Atkinson's live complaint, and it is hard to fathom how a liberty interest is implicated by the allegations contained in the lawsuit. In opposing the motion to dismiss, Ms. Atkinson claims that she was deprived of a protected liberty interest by virtue of Dr. Pustilnik's alleged violations of the "First, Fourth, and Fourteenth Amendment[s]." Dkt. 33 at 14. This argument, however, blissfully ignores the Supreme Court's express instruction "not to apply the Fourteenth Amendment's substantive-due-process catchall when another, more specific constitutional provision applies." *Pinkston v. Kuiper*, 67 F.4th 237, 241 (5th Cir. 2023). "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the

standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *Albright*, 510 U.S. at 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))). For this reason, Ms. Atkinson has not sufficiently alleged a protected liberty interest.

I now turn to the property interest inquiry. "[F]or a person to have a property interest within the ambit of the Fourteenth Amendment, he 'must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Blackburn v. City of Marshall*, 42 F.3d 925, 936 (5th Cir. 1995) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "Property interests are not created by the Constitution; rather, they stem from independent sources such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings." *Blackburn*, 42 F.3d at 936–37. In her response to Dr. Pustilnik's motion to dismiss, Ms. Atkinson argues that the "$1 million worth of insurance proceeds" constitute a property interest to which she was deprived. Dkt. 33 at 15.

Setting aside that this allegation is raised in Ms. Atkinson's response and not the live complaint, it is unavailing. Ms. Atkinson points to *Connecticut v. Doehr* for the proposition that "even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection." 501 U.S. 1, 12 (1991). That case, however, is inapposite for two reasons: (1) it is a *procedural*, not a substantive, due process case; and (2) it pertains to encumbrances on real property—not life insurance policy proceeds, as is the case here. Ample case law holds that there is no property interest to insurance proceeds—even from policies issued by local governmental bodies. *See, e.g., Loc. 342, Long Island Pub. Serv. Emps., UMB, ILA, AFL-CIO v.*

19

*Town Bd. of Town of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1994) ("In view of our conclusion that the Union possessed no protectible property interest in the insurance payments, it would appear obvious that the Town's termination of those payments in no way violated the substantive due process rights of Local 342."). Accordingly, Ms. Atkinson does not have a property interest in the insurance proceeds.

* * *

Ms. Atkinson has not identified a liberty or property interest of which she has been deprived. As a result, Dr. Pustilnik is entitled to qualified immunity, and Ms. Atkinson's substantive due process claim fails at the motion to dismiss stage.

**D.    VIOLATION OF THE FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEIZURES**

The Fourth Amendment prohibits unreasonable seizures. *See* U.S. CONST. amend. IV. In order to state a claim under § 1983 for an unreasonable seizure, Ms. Atkinson must allege that (1) she was seized within the meaning of the Fourth Amendment; and (2) the seizure was unreasonable. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989). Ms. Atkinson's Fourth Amendment claim fails on both counts.

Ms. Atkinson alleges she was seized when Dr. "Pustilnik convened an inquest and ordered [her] to appear and testify at that inquest even though he had no legal authority to act in such a way." Dkt. 21 at 18. The fundamental flaw with Ms. Atkinson's claim is that she agreed to appear at the inquest. It is undisputed that a Fort Bend County justice of the peace—not Dr. Pustilnik—ordered Ms. Atkinson to appear at the inquest and produce all ammunition in her home that could have been used from the gun that caused Mr. Atkinson's death. After originally moving to quash the subpoena, Ms. Atkinson ultimately *agreed* to appear at the inquest and *agreed* to produce the ammunition. This voluntary cooperation tanks Ms. Atkinson's Fourth Amendment claim. *See* Dkt. 33-4 at 32.

In the Fourth Amendment context, "a seizure occurs when, under the totality of the circumstances, a reasonable person would have thought he was not free to leave." *Keller v. Fleming*, 952 F.3d 216, 222 (5th Cir. 2020). "Physical force is not required to effect a seizure; however, absent physical force, '*submission* to the assertion of authority' is necessary." *McLin*, 866 F.3d at 691 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). Because Ms. Atkinson voluntarily appeared at the inquest, no seizure took place. Her Fourth Amendment claim falls short.

Even if Ms. Atkinson properly alleged that a seizure occurred, her Fourth Amendment claim would still fail because she has not sufficiently alleged that any seizure was unreasonable. Only unreasonable searches and seizures violate the Fourth Amendment. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("[T]he touchstone of the Fourth Amendment is reasonableness." (quotation omitted)). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Id.* As the Chief Medical Examiner, Dr. Pustilnik unquestionably possessed the right to convene an inquest to determine the cause and manner of Mr. Atkinson's death.[7] *See* TEX. CODE CRIM. PROC. art. 49.25 § 6(a). "All that the [F]ourth [A]mendment requires is that the administrative subpoena be relevant, definite, and within the bounds of statutory authority." *McClendon v. Jackson Television, Inc.*, 603 F.2d 1174, 1177 (5th Cir. 1979). Speaking to the spouse of the deceased is relevant and within Dr. Pustilnik's statutory authority.

---

[7] Ms. Atkinson complains that Dr. Pustilnik did not have the legal authority to conduct an inquest because he never took an oath of office or executed a bribery statement. She is mistaken. Texas law is clear that county medical examiners need not take an oath of office or execute a bribery statement. *See Arredondo v. State*, 406 S.W.3d 300, 304 (Tex. App—San Antonio 2013, pet. ref'd) (finding that county medical examiners are not "public officers" under the Texas Constitution).

This provides an independent reason why Ms. Atkinson's Fourth Amendment claim should be dismissed at the pleading stage.

Overall, the facts, as alleged by Ms. Atkinson, are insufficient to make out a violation of the Fourth Amendment. As such, Dr. Pustilnik is entitled to qualified immunity on this claim.

### THE FORT BEND DEFENDANTS' MOTION TO DISMISS

Ms. Atkinson acknowledges that the Fort Bend Defendants did not directly participate in any alleged constitutional violation. Instead, she claims the Fort Bend Defendants are liable under theories of ratification and failure to supervise.

Because I have found Ms. Atkinson has not sufficiently stated a claim for violation of her equal protection rights, substantive due process rights, or the right to be free from unreasonable seizures,[8] any claim for supervisory liability against the Fort Bend Defendants based on those alleged constitutional violations must be dismissed. *See Pena v. Givens*, 637 F. App'x 775, 785 (5th Cir. 2015) ("Supervisory liability requires a constitutional violation by a subordinate."). Ms. Atkinson's claim for supervisory liability based on Dr. Pustilnik's alleged First Amendment retaliation must also be dismissed insofar as the delayed issuance of the death certificate is concerned because, as discussed above, Ms. Atkinson fails to state such a claim. "Further, because there is no underlying constitutional violation, [Fort Bend Defendants] also cannot be held liable under a ratification theory." *Mazoch v. Carrizales*, 733 F. App'x 179, 184 (5th Cir. 2018).

With respect to the Fort Bend Defendants, the sole question I must address is whether Ms. Atkinson has sufficiently stated a claim for ratification or supervisory liability related to her First Amendment retaliation claim based on Dr. Pustilnik's allegedly false designation of Mr. Atkinson's manner of death. As

---

[8] The Individual Fort Bend Defendants are also entitled to qualified immunity on these claims because I have determined that Ms. Atkinson has not sufficiently alleged a constitutional violation.

explained below, Ms. Atkinson's claims for ratification and supervisory liability both fall well short of what is required.

## A.  RATIFICATION

On February 17, 2023, after Dr. Pustilnik allegedly falsified Mr. Atkinson's manner of death, Ms. Atkinson's counsel sent a letter to the Fort Bend Defendants informing them that SLPD had "performed firearms tests long before [Dr.] Pustilnik claimed that he needed to conduct firearms tests." Dkt. 21 at 13. He also reminded the Fort Bend Defendants of an October 3, 2022 letter asking them "to intervene and exercise supervisory authority over [Dr.] Pustilnik." *Id.* Because the Fort Bend Defendants "were informed *in writing* about [Dr.] Pustilnik's ongoing constitutional violations (as well as their potential liability)" and "took no action to reign him in," Ms. Atkinson contends the Fort Bend Defendants have ratified Dr. Pustilnik's conduct. Dkt. 34 at 4.

The ratification theory of municipal liability can be traced to the Supreme Court case of *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). In *Praprotnik*, a plurality of the Supreme Court recognized "a scenario in which a municipality could be held liable for a single episode of conduct initiated by a non-policymaker employee." *Milam v. City of San Antonio*, 113 F. App'x 622, 626 (5th Cir. 2004). The Supreme Court explained:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127. The Fifth Circuit has held that the ratification theory is an appropriate basis for imposing municipal liability only in "extreme factual situations." *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017) (quotation omitted). "Therefore, unless the subordinate's actions are sufficiently extreme—for instance, an obvious violation of clearly established law—a policymaker's ratification or defense of his subordinate's actions is insufficient to

establish an official policy or custom." *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009).

Although the scope of the ratification theory is not always clearly defined, there is no question that "policymakers who simply go along with a subordinate's decision do not thereby vest final policymaking authority in the subordinate, nor does a mere failure to investigate the basis of a subordinate's discretionary decisions amount to such a delegation." *Milam*, 113 F. App'x at 627 (cleaned up). Similarly, "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009). These limitations on municipal liability are vital to prevent the ratification theory from becoming a theory of *respondeat superior*, a concept the Supreme Court has expressly rejected. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (a local governmental entity is not vicariously liable under § 1983 for its employees' conduct); *Praprotnik*, 485 U.S. at 126 ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.").

In this case, Ms. Atkinson's counsel claims he sent several communications to the Fort Bend Defendants complaining about Dr. Pustilnik. The Fort Bend Defendants reportedly took no action in response. Even if true, these allegations are insufficient to support a viable ratification theory against the Fort Bend Defendants. I am unaware of any case law suggesting that a municipality automatically ratifies the conduct of its officials when it fails to take disciplinary action in response to public complaints. To the contrary, the Fifth Circuit has routinely held that allegations that a municipality declined to punish an officer's conduct do not, taken alone, establish unconstitutional ratification. *See Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992) ("[Plaintiffs] merely argue that the city ratified Lowery's actions because it refused to discipline him, and because it allegedly knew that Lowery's version of the incident was untrue. Such

allegations are wholly insufficient."). Simply stated, a municipality cannot be liable under the ratification theory unless its policymaker ratified what it knew at the time to be unconstitutional conduct. *See Praprotnik*, 485 U.S. at 127–30. There are no such allegations in the instant lawsuit.

> A passage I wrote in another ratification case is equally applicable here:
>
> In [Ms. Atkinson's] view, [Fort Bend] County should face liability in this case because it accepted [Dr. Pustilnik's] version of events and refused to discipline him for something he claimed he did not do. [Ms. Atkinson's] theory of liability in this case attempts to turn Section 1983 liability on its head by imposing liability on a governmental entity anytime it accepts [its] employee's account of an incident. That is not, and has never been, the law. [Fort Bend] County is entitled to believe [Dr. Pustilnik's] version of events without automatically subjecting itself to liability if he is incorrect. *See Diamond-Brooks v. City of Webster*, No. 12-CV-3482, 2014 WL 527910, at *8 (S.D. Tex. Feb. 6, 2014) ("the policymaker does not ratify unconstitutional behavior simply because he believes the officer's version of events . . . even if that version is subsequently proven to be wrong.") (internal quotation marks and citations omitted).

*Jennings v. Brazoria Cnty.*, No. 3:17-cv-00243, 2018 WL 7625012, at *5 (S.D. Tex. Dec. 12, 2018).

The same analysis applies to the individual capacity ratification claims. *See Barker on Behalf of Barker v. City of Plaquemine*, No. 17-340, 2019 WL 4580047, at *6 (M.D. La. Sept. 20, 2019) (dismissing an individual capacity ratification claim because "the failure . . . to discipline an officer for allegedly unconstitutional conduct, without more, does not constitute ratification or endorsement of the officer's behavior").

As such, Ms. Atkinson's ratification theory cannot pass muster at the pleading stage.

## B. FAILURE TO SUPERVISE

Ms. Atkinson's allegation that the Fort Bend Defendants were "deliberately indifferent" to Dr. Pustilnik's misconduct is a § 1983 claim for failure to supervise. *See Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003). The Supreme Court has expressly rejected the notion that government officials may be held liable merely because they had knowledge of their subordinate's misconduct. *See Iqbal*, 556 U.S. at 677 ("In a §1983 suit . . . the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). In accordance with this guidance, the Fifth Circuit has held that a supervisor may only be liable when he "affirmatively participates in the acts that cause the constitutional deprivation, or [he] implements unconstitutional policies that causally result in the constitutional injury." *Pena v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018).

There are no such allegations here. Ms. Atkinson simply claims that her attorneys sent the Fort Bend Defendants emails and letters that outlined her complaints against Dr. Pustilnik. Absent any factual allegations concerning personal involvement on the part of the Individual Fort Bend Defendants, there is no valid basis to hold them liable in their individual capacities merely because they held county-wide positions. *See Thompson v. Crnkovich*, No. 1:16-cv-055, 2017 WL 5514519, at *2 (N.D. Tex. Nov. 16, 2017) ("Without personal involvement or participation in an alleged constitutional violation, or implementation of a deficient policy, the individual should be dismissed as a defendant."). Dismissal of the supervisory liability claim against Fort Bend County is also appropriate, as there is no factual basis for which Fort Bend County can be held liable.

## CONCLUSION

For the reasons identified above, Dr. Pustilnik's motion to dismiss (Dkt. 27) is **GRANTED IN PART** and **DENIED IN PART**. All claims against Dr. Pustilnik are dismissed except for the First Amendment retaliation claim based on Dr. Pustilnik's allegedly false designation of Mr. Atkinson's manner of death. The Fort

Bend Defendants' motion to dismiss (Dkt. 28) is **GRANTED**, and this case is dismissed against the Fort Bend Defendants.

SIGNED this 2nd day of May 2024.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE